**IT IS HEREBY ORDERED** that defendants' motion to dismiss [Doc. # 5] is granted in part and denied in part.

**IT IS FURTHER ORDERED** that the parties' joint request for oral argument [Doc. # 12] is denied.

**IT IS FURTHER ORDERED** that defendants' motion for reconsideration of the Order of May 30, 2001, for leave to file opposition to plaintiff's motion to compel, and for a protective order [Doc. # 29] is denied.

**IT IS FURTHER ORDERED** that defendants shall produce to plaintiff, *no later than June 25, 2001,* copies of all documents identified in defendants' Rule 26 disclosures. The parties shall confer forthwith in good faith in an effort to stipulate to an appropriate protective order, and shall file their stipulation no later than *June 18, 2001. A courtesy copy of a stipulated protective order shall be submitted directly to the Court's chambers in Room 16.182.*

**Brenda JAROS, Plaintiff,**

v.

**LODGENET ENTERTAINMENT CORP., Defendant.**

**No. Civ 00–4007.**

United States District Court,
D. South Dakota,
Southern Division.

Aug. 30, 2001.

Richard D. Casey, Sioux Falls, SD, for plaintiff.

Susan Brunick Simons, Melissa C. Hinton, Davenport, Evans, Hurwitz & Smith, Sioux Falls, SD, for defendant.

## MEMORANDUM OPINION AND ORDER

PIERSOL, Chief Judge.

After the Plaintiff, Brenda Jaros, obtained a $500,000 judgment on her claim of sexual harassment against the Defendant, LodgeNet Entertainment Corporation (LodgeNet), both she and LodgeNet filed several post-trial motions. LodgeNet has filed a motion to amend the judgment, a motion for judgment as a matter of law, and an alternative motion for a new trial. Jaros has filed motions for awards of back pay, front pay, and attorney fees.

## BACKGROUND

In her Complaint, Jaros alleged that she was sexually harassed by her supervisor, Ted Racz, while she worked as Racz's administrative assistant at LodgeNet. Racz was LodgeNet's vice president of sales. The evidence at trial showed that Racz began making sexually suggestive comments to Jaros almost as soon as she began working at LodgeNet in March 1998, and continued to do so "basically daily" until the middle of December. During that time, Racz complimented Jaros on her appearance and body type. He suggested on numerous occasions that they engage in sexual relations with each other. Racz told Jaros, "I bet you get wet," and said that she would be "a good f--." He bragged about his ability to perform oral sex, gave Jaros unmarked videotapes that turned out to contain pornography, and told her that he was going to come over to her home and watch them. Racz once commented to another employee that Jaros had "a nice butt," asked several times if he could touch it, and one day tried more than once to unzip a sweater that Jaros was wearing.

Another co-worker, Charles Siemonsma, also made sexual overtures to Jaros. Towards the end of May 1999, Siemonsma called Jaros late at night, asked Jaros about her recent sex life, and told her that he was coming over to her house. After Jaros threatened that her elderly neighbors would call the police, Siemonsma de-

cided not to come over. Jaros reported the incident to Racz, who told her that it was "just a phone call." In August, during a golf outing in Florida, while he and three other men posed for a photograph taken by Jaros, Siemonsma and one of the men grabbed their crotches. (The photograph itself was admitted as Exhibit 11 at the trial.) Some time later, Racz did report the phone call to management while he was involved in a landlord-tenant dispute with Siemonsma. Although Siemonsma was reprimanded for the late-night phone call, Jaros was never told of the reprimand or even that the phone call incident had been investigated.

Eventually, in December 1999, Jaros told LodgeNet's director of human resources, Don McCoy, that she was being sexually harassed by Racz. When McCoy asked her for details, Jaros refused to provide them, telling McCoy that she was afraid Racz would find out and make her life "a living hell." She asked McCoy to promise that whatever details she provided would be kept secret, but McCoy told her that he would have to investigate, which would mean telling both Racz and upper management. McCoy did not remind Jaros that LodgeNet's sexual harassment policy, which prohibited sexual harassment, also prohibited retaliation against employees who reported harassment. During at least one subsequent meeting, McCoy again asked for details, Jaros again refused to provide them, and McCoy again failed to tell Jaros that she would be protected from harassment.

On January 15, 2000, Jaros tendered her letter of resignation. LodgeNet later investigated her claims of harassment, but determined that they could not be verified. Jaros then returned to college and earned a teaching certificate. Jaros testified at trial that her experience working for Racz has made it extremely difficult for her to work for other men. The jury found that Jaros had been constructively discharged from her job at LodgeNet, and awarded her $500,000 in compensatory damages.

## DEFENDANT'S MOTIONS

LodgeNet has filed three post-trial motions: (1) a motion to amend the judgment, (2) a motion for judgment as a matter of law, and (3) an alternative motion for new trial. For the reasons stated below, the motion to amend the judgment is granted, and the motion for judgment as a matter of law and alternative motion for a new trial are denied.

### A. Motion to Amend the Judgment

■ The jury verdict of $500,000 must be reduced to $300,000. In the Civil Rights Act of 1991, Congress enacted limits on the amount of damages a Title VII plaintiff may recover for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 121 S.Ct. 1946, 1949, 150 L.Ed.2d 62 (2001). Because LodgeNet has more than 500 employees, the limit on such compensatory damages in this case is $300,000. 42 U.S.C. § 1981a(b)(3)(D). This cap on damages is constitutional, *see Madison v. IBP, Inc.*, 257 F.3d 780, 804 (8th Cir.2001), and the judgment on the jury verdict in this case will accordingly be reduced to $300,000.

Contrary to Jaros's argument, allocating the $500,000 awarded by the jury between the two verdicts of sexual harassment and constructive discharge will not allow her to avoid the statutory limit. As a matter of simple arithmetic, the $500,000 award could be divided into two amounts that are each less than $300,000. The federal statutory limits, however, do not apply to the amounts awarded on separate federal claims, but rather to "the sum of the

amount of compensatory damages" awarded "for each complaining party." 42 U.S.C. § 1981a(b)(3); *cf. Galliher v. Rubin,* 969 F.Supp. 1329, 1330–31 (S.D.Ga. 1997) (plaintiff whose separate Title VII actions were consolidated was entitled to no more than a single award of $300,000). As the sole complaining party in this case, Jaros is limited to $300,000 in damages on all of her claims under Title VII. While an award of damages that exceeds the applicable limit in section 1981a(b)(3) may sometimes be allocated between a federal claim and a state claim, *see Madison, supra,* at 801–02, there is no basis for applying the rule in this case, because allocation is not necessary to allow the vindication of the plaintiff's rights under state law.

### B. *Motion for Judgment as a Matter of Law*

■ "Under Rule 50, a court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.' " *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 149, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000). When ruling on a motion for judgment as a matter of law, the district court must accord the nonmoving party the benefit of all reasonable inferences, but may not give that party the benefit of unreasonable inferences or resort to speculation. *Fought v. Hayes Wheels Int'l, Inc.,* 101 F.3d 1275, 1277 (8th Cir .1996). LodgeNet argues that it is entitled to judgment as a matter of law on the ground that a finding of constructive discharge should not have prevented it from raising an affirmative defense under *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257 (1998) and *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and on the ground that there was insufficient evidence

to support the jury's finding of constructive discharge.

### 1. *Availability of the Affirmative Defense*

■ In the twin cases of *Ellerth* and *Faragher,* the Supreme Court addressed the circumstances under which an employer may be held liable for a supervisor's creation of a hostile work environment for a subordinate. Under the rule developed by the Supreme Court, an employer is strictly liable if the supervisor has taken a "tangible employment action." *Ellerth,* 524 U.S. at 760–62, 118 S.Ct. 2257. If the supervisor has not taken a tangible employment action, the employer may raise an affirmative defense based on its efforts to prevent and correct harassment and the employee's failure to avoid harm. *Id.* at 765, 118 S.Ct. 2257. The question here is whether a constructive discharge counts as a "tangible employment action" that blocks the affirmative defense.

■ In the context of this case, it does. A "tangible employment action" is the type of employment injury that can be caused only by a supervisor or another person "acting with the authority of the company." *Ellerth,* 524 U.S. at 761–62, 118 S.Ct. 2257. Ted Racz could not have made Jaros's working conditions intolerable in the way that he did if his sexually harassing behavior had not been backed by the authority of LodgeNet. Racz, who had the authority to hire and fire Jaros, began harassing her almost as soon as she started to work at LodgeNet. As the harassment grew worse, it was Jaros's fear that Racz would use his position in LodgeNet to retaliate that kept her from reporting the harassment. When Jaros told Donald McCoy that she was afraid things would get worse if he investigated, McCoy did nothing to allay her fears, but told her that an investigation would take place

whether or not she wanted one. Thus, Racz's sexual harassment of Jaros was aided by his position as a supervisor at LodgeNet and by the failure of other members of LodgeNet's management to neutralize Racz's position of control over Jaros. *See Cherry v. Menard, Inc.*, 101 F.Supp.2d 1160, 1171–77 (N.D.Iowa 2000) (criticizing decisions of other courts and holding that constructive discharge can be a tangible employment action).

 Given the jury's finding of constructive discharge, LodgeNet could not have prevailed on its affirmative defense even if the defense had been available. To prove its affirmative defense, LodgeNet would have had to show: (a) that it exercised reasonable care to prevent and correct promptly Racz's sexually harassing behavior, and (b) that Jaros unreasonably failed to take advantage of any preventive or corrective opportunities provided by LodgeNet or to avoid harm otherwise. *See Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257. In finding that Jaros had been constructively discharged, the jury determined that LodgeNet made her working conditions intolerable, that Jaros's sex was a motivating factor in LodgeNet's actions, and either that LodgeNet acted with the intent of forcing Jaros to quit or that her resignation was a reasonably foreseeable result of LodgeNet's actions. *See* Jury Instruction No. 15, *Eighth Circuit Manual of Model Civil Jury Instruction* No. 5.93. The jury also implicitly found that Jaros did not quit without giving LodgeNet a reasonable chance to work out the problem. *See* Jury Instruction No. 16. These findings, which were essential to the jury's verdict, rule out possible findings that LodgeNet exercised reasonable care · or that Jaros acted unreasonably, as would be required for LodgeNet successfully to assert the affirmative defense recognized in *Faragher* and *Ellerth*.

### 2. Evidence in Support of Constructive Discharge

 There was sufficient evidence to sustain a verdict of constructive discharge. As LodgeNet correctly observes, "[a]n employee who quits without giving [her] employer a reasonable chance to work out a problem has not been constructively discharged." *Phillips v. Taco Bell Corp.*, 156 F.3d 884, 890 (8th Cir.1998). Although Racz denied Jaros's allegations during LodgeNet's investigation, he was not a witness at trial, where there was ample evidence of severe and frequent harassment. Based on the evidence at trial, the jury could have found that Jaros gave LodgeNet a chance to correct Racz's harassment when she reported the harassment to McCoy. While Jaros refused to provide details of the harassment, she told McCoy that she was reluctant to do so because she was afraid that nothing would be done and that she would not be protected from retaliation by Racz. Her fear was not unreasonable, given LodgeNet's previous failure to let Jaros know that anything had been done about her complaint regarding Chuck Siemsonsma, and Siemonsma's subsequent vulgar conduct on the Florida golf course. Although Jaros expressed her fear of retaliation, McCoy did not take the simple step of reminding her that retaliation was forbidden under LodgeNet's sexual harassment policy, but rather demanded details and told her that an investigation would be conducted no matter what she told him. Under these circumstances, the jury was entitled to find that Jaros did not jump to conclusions too quickly, but quit only after giving LodgeNet a reasonable chance to work out the problem.

These circumstances distinguish Jaros's case from other sexual harassment cases in which summary judgment has been granted to the employer under *Faragher*

and *Ellerth.* For example, in the recent case of *Matvia v. Bald Head Island Management,* 259 F.3d 261, 2001 WL 861980 (4th Cir. July 31, 2001), there was no evidence that the employer was deficient in the administration of its sexual harassment policy. In this case, there was evidence that LodgeNet mis-administered its sexual harassment policy and that Jaros did not act unreasonably when she refused to provide details about Racz's harassing conduct.[1]

### B. Motion for a New Trial

 A new trial should be granted if the ends of justice so require. *See Pitts v. Electro–Static Finishing, Inc.,* 607 F.2d 799, 804 (8th Cir.1979). "Courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial." 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 2803 at 46–47 (1995). LodgeNet raises six arguments in support of its request for a new trial: (1) the size of the verdict shows that it was the result of passion and prejudice and that it warrants remittitur, (2) evidence of Jaros's sexual comments in the workplace should have been admitted at trial, (3) evidence of the conduct of Chuck Siemsonsma should have been excluded from trial, (4) the photograph of Chuck Siemonsma and three others on the Florida golf course (Exhibit 11) should have been excluded from the trial, (5) the

verdict was against the weight of the evidence, and (6) the jury instruction on constructive discharge was erroneous. None of these arguments warrants a new trial.

### 1. Size of the Verdict

 The size of the jury's verdict does not dictate that it be set aside. A district court must set aside a jury's verdict if the court has determined that the verdict is the result of passion or prejudice or that the verdict is clearly excessive. *Ouachita Nat'l Bank v. Tosco Corp.,* 686 F.2d 1291, 1294 (8th Cir.1982). In assessing the verdict, the district court may "weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to support the verdict." *Id.* at 1294–95.

 At the trial, Jaros provided credible testimony about the humiliation, emotional pain, inconvenience, and loss of enjoyment of life she endured because of Racz's conduct towards her. According to the Jaros's testimony, Racz used sexual innuendo and sexual propositions to humiliate her "basically daily" for more than seven months. He also made unwelcome physical advances, asking to "touch her butt" and trying to unzip her sweater. This conduct made Jaros "feel like dirt," and made her "scared to death" to go on a trip to Florida with Racz and other employees, for fear that Racz might try to act out his propositions and suggestions. Jaros's testimony as to the mental anguish she suffered as the result of Racz's actions was corroborated by her family and a

---

1. The Fourth Circuit's decision in *Matvia* is not directly on point, since the issue at the summary judgment stage in *Matvia* was whether the plaintiff could overcome the defendant's affirmative defense under *Faragher* and the issue in this case is now whether there was sufficient evidence at trial to support a finding of constructive discharge. As suggested above, however, the issues of the

*Faragher* affirmative defense and constructive discharge were very similar in this case. Both required an analysis and comparison of the reasonableness of the conduct of LodgeNet and Jaros. Moreover, a finding of constructive discharge in this case was equivalent to a finding against LodgeNet on the affirmative defense.

treating psychologist, as well as her co-workers, who observed that Jaros lost weight and started to look worse as her term at LodgeNet wore on. Even at trial, Jaros was still very thin and did not appear to be at a healthy weight. Her deterioration was illustrated by a photograph offered into evidence at trial, which showed Jaros at a healthy weight early on in her tenure at LodgeNet. The end result of the harassment was that Jaros, a single mother, was forced to quit a job she needed to support her two children and go back to college. Both Jaros and her psychologist testified that, since her experience with Racz, she continues to suffer mental anguish about working under the supervision of men.

Any reasonable person who had been made the victim of Racz's conduct would have been offended by it. How the conduct would affect someone, however, would vary from person to person. Jaros was convincing at trial in demonstrating that the effect upon her was devastating. The $500 Jaros paid to her psychologist is not, as LodgeNet argues, a fair benchmark of the suffering she has endured. Jaros testified that she only saw the psychologist on a few occasions because those sessions were all she was able to afford. The fact that Jaros could not afford to pay more showed that the loss of her job at LodgeNet made it even more difficult for her to deal with the other effects of Racz's conduct.

The evidence does not warrant a new trial. The verdict of $500,000 is surely generous, but it is not so grossly excessive as to shock the conscience of the Court. The plaintiff's case was far stronger at trial than the case she presented on paper before the trial. The evidence is sufficient to support an award at the statutory limit of $300,000. It is true that some cases involving more pervasive and more serious harassment have resulted in smaller awards. *See, e.g., Madison,* 257 F.3d 780 (8th Cir.2001) (award of $266,750 for at least eight years of sexual and racial harassment in an Iowa meat-packing plant). The larger verdict in this case is legitimately explained by the fact that the plaintiff was particularly emotionally fragile and was working in an environment—the office of a major corporation—where the coarseness of the harassment she suffered was less expected and more insulting than it would have been in some other environments, such as a meat-packing plant or a construction site. While the evidence may not support the actual verdict of $500,000, the difference between the $500,000 verdict and the $300,000 award supported by the evidence is not so great as to warrant a finding that "the jury's verdict was the result of passion and prejudice. *Cf. Ramirez v. New York City OTB Corp.,* 112 F.3d 38, 41 (2d Cir.1997) ("The cases in which the jury's award is seen to reflect prejudice ... are generally limited to those in which the remittitur granted is totally out of proportion to the damages allowed by the district court"). Because the damages must be reduced to $300,000 under the statutory cap, there is no reason to order a remittitur.

### 2. *Sexual Overtones in the Workplace*

LodgeNet argues that several pieces of evidence regarding Jaros's workplace conduct should have been admitted under Rule 412 of the Federal Rules of Evidence. In particular, LodgeNet argues that the Court should have admitted into evidence: (a) an alleged comment Jaros made to a co-worker about picking up men in a local bar, (b) examples of Jaros's use of vulgar language, and (c) descriptions of the provocative clothing that Jaros wore to work. The provisions of Rule 412 apply in this case, and require that evidence of an alleged victim's sexual behavior or sexual predisposition have a probative value that

substantially outweighs the danger of harm to any victim and of unfair prejudice to any party. *See Wolak v. Spucci,* 217 F.3d 157, 160 (2d Cir.2000).

### a. The Sexual Comment by Jaros

█ LodgeNet proffered testimony by one of Jaros's co-workers, Dan Bilbo, that she once told him that she liked to pick up men at a local bar, take them home, and have sex with them. The fact that this claimed comment was made in the workplace made it more relevant than if it had been made outside the workplace. *See Scusa v. Nestle U.S.A. Co.,* 181 F.3d 958, 967 (8th Cir.1999). Nevertheless, its probative value was substantially undercut by the facts that Jaros did not make the claimed comment to Racz and that Racz did not learn of the claimed comment until after Jaros quit working at LodgeNet. Assuming for purposes of this decision that Jaros made the comment to Dan Bilbo, it does not follow that she welcomed Ted Racz's conduct or that the claimed comment gave Racz a reason to believe that his conduct was welcome. There was no evidence that Jaros made other comments of this kind at work. Even if Jaros made the alleged comment, she still would have been entitled to claim the protection of the law against sexual harassment. Evidence of the alleged comment, if admitted, would have unfairly prejudiced Jaros, by improperly suggesting that she was not entitled to that protection. The evidence was inadmissible under Rule 412 because its probative value did not substantially outweigh the danger of unfair prejudice to Jaros. It would have been inadmissible even under Rule 403, because the danger of unfair prejudice substantially outweighed its probative value.

### b. Vulgar Language

█ LodgeNet also argues that it should have been allowed to introduce evidence that Jaros used the f-word at work. It is uncertain whether the use of obscenity is sexual enough to be covered by Rule 412. Like Jaros's comment to Dan Bilbo, however, her use of obscene language would have been inadmissible even under Rule 403, because there was nothing to suggest that her obscene language invited sexual harassment. *See Carr v. Allison Gas Turbine Division, General Motors Corp.,* 32 F.3d 1007 (7th Cir.1994) (plaintiff's use of the words "f--- head" and "d--- head" did not invite harassment).

### c. Provocative Dress

█ Evidence to the effect that Jaros "dressed in a manner that accentuated her figure more than was appropriate for the workplace" was inadmissible under Rule 412. The Supreme Court has observed that a complainant's sexually provocative speech or dress is "obviously relevant" to whether she found particular sexual advances unwelcome. *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 69, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Under Rule 412, however, the probative value of such evidence must substantially outweigh the danger of unfair prejudice. Fed.R.Evid. 412(b)(2). In this case, the probative value of Jaros's attire was not strong. The only evidence excluded from trial were comments that Jaros sometimes wore tight-fitting clothing. The proffered evidence was very weak. Most of Racz's comments, moreover, had nothing to do with what Jaros was wearing, and many had less to do with Jaros's figure than Racz's own claimed sexual prowess or his speculation about Jaros's sex life. The evidence proposed by LodgeNet, if admitted at trial, would have carried the attendant danger that jurors would base their verdicts on their opinions about Jaros's morality and not the law of sexual harassment. While the aspects of Jaros's dress proffered by LodgeNet prior to trial were marginally relevant, their probative value was not

substantial enough to warrant their admission under Rule 412. *Cf. Wolak*, 217 F.3d at 160 (evidence about the plaintiff's viewing pornography was, at best, marginally relevant, and hence inadmissible in a sexual harassment case).

### 3. *Conduct of Chuck Siemonsma*

██ LodgeNet correctly notes that Chuck Siemonsma's late-night telephone call and subsequent behavior at the golf outing were not severe enough to constitute independent evidence of sexual harassment. Contrary to LodgeNet's argument, however, Siemonsma's conduct did not have to be actionable in order to be relevant and admissible. These particular incidents were relevant to both to how closely LodgeNet followed its sexual harassment policy and to whether Jaros was reasonable to fear inaction or retaliation after she reported Racz's harassment to McCoy. The jury was given limiting instructions to this effect. *See* Limiting Instruction & Jury Instruction No. 7.

### 4. *Photograph from the Golf Course (Exhibit 11)*

██ This photograph, which was taken by Jaros and depicts Chuck Siemonsma grabbing his crotch while posing on a golf course, was admissible for the same reason that Siemonsma's other conduct was admissible. After Jaros reported Siemonsma's late-night phone call to Ted Racz, as LodgeNet's sexual harassment policy said she could do, she was never told that LodgeNet had acted on the complaint. Siemonsma's subsequent unwelcome conduct on the golf course, while it did not rise to the level of actionable sexual harassment, could reasonably have led Jaros to believe that LodgeNet had not taken her earlier complaint seriously. Whether Jaros had such a belief was relevant to whether she acted reasonably in withholding details of Racz's harassment from McCoy. This photograph was so far

removed from the conduct of Racz that there was little danger that it would confuse the jury. Whatever such danger existed was eliminated by the limiting instructions given about the conduct of Chuck Siemonsma.

### 5. *Weight of the Evidence*

The jury's verdict was not against the weight of the evidence. LodgeNet points out several inconsistencies between the Jaros's testimony at trial, on the one hand, and her deposition and verified complaint, on the other. Jaros was confronted with these discrepancies on cross-examination, and the jury was free to believe or disbelieve her explanations. Her credibility certainly was not so diminished as to justify setting aside the jury's verdict.

### 6. *Constructive Discharge Instructions*

LodgeNet also argues that the instructions given to the jury did not accurately set forth the law governing constructive discharge. LodgeNet claims that the instructions were defective because they failed to inform the jury that: (1) Jaros had to establish more than just a violation of Title VII, (2) to be liable, LodgeNet had to have *deliberately* made Jaros's work environment intolerable, and (3) that whether the work environment was intolerable was not to be judged by Jaros's subjective feelings.

██ The Court's constructive discharge instructions were adequate. A district court has discretion in the style and wording of jury instructions, as long as the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submit the case to the jury. *Kelly v. Armstrong*, 206 F.3d 794, 800 (8th Cir.2000). The Eighth Circuit's pattern instruction on constructive discharge, Number 5.93, was given to the jury. Jury Instruction 15. This instruc-

tion adequately informed the jurors that constructive discharge was something more than a violation of Title VII, by listing the elements of constructive discharge. In the Eighth Circuit, an employer deliberately causes an employee to quit when it acts with the intention of forcing the employee to quit or when the employee's resignation is a reasonably foreseeable consequence of the employer's actions. *Phillips v. Taco Bell*, 156 F.3d 884, 890 (8th Cir.1998). This aspect of constructive discharge is also adequately covered by the Eighth Circuit pattern instruction. Finally, the jury was instructed that "[w]orking conditions are intolerable if a reasonable person in [Jaros's] situation would have deemed resignation the only reasonable alternative." Jury Instruction No. 16. The jurors were also told that "an employee has an obligation not to assume the worst and not to jump to conclusions too quickly." *Id.* These instructions were sufficient to inform the jurors that whether Jaros's work environment was intolerable had to be judged by an objective, rather than a subjective, standard.

LodgeNet also re-asserts its argument that constructive discharge is not a tangible employment action. For the reasons already stated above, the jury's finding that Jaros was constructively discharged was a finding of a tangible employment action in this case.

### PLAINTIFF'S MOTIONS

Jaros has filed three post-trial motions: (1) a motion for back pay, (2) a motion for front pay, and (3) a motion for attorney fees. For the reasons stated below, Jaros's motions for back pay and attorney

fees are granted in part and denied in part, and her motion for front pay is denied.

### A. *Back Pay*

■ Under Title VII, an award of back pay is not automatic or mandatory, but rather lies within the sound discretion of the district court. *Ford Motor Co. v. EEOC*, 458 U.S. 219, 226, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982). After Jaros quit her job at LodgeNet, she attended Augustana College for one year and obtained a teaching certificate. She did not work during college, as she testified that despite the financial hardship she wanted to complete college as quickly as possible so she could enter the job market after she graduated. Jaros reasons that if she had remained at LodgeNet, she would have continued to receive her former salary plus a raise of 4% per year. On this assumption, her LodgeNet salary would have been $23,324.08 in 1999 and $24,257.04 in 2000. Jaros's net income was $2,708 in 1999 and $22,299.59 in 2000. Subtracting these amounts from what she believes she would have earned at LodgeNet, Jaros calculates her lost wages at $22,573.53. Jaros also paid $2,303.91 for health insurance before she was able to find another job, as well as a $30 dental bill that would have been covered by her insurance at LodgeNet. The total of these amounts—$24,907.44—will be awarded as back pay.[2]

■ Jaros is entitled to this award, even though she stopped working for a year to attend college. To be eligible for back pay, a Title VII claimant must "use reasonable diligence in finding other suit-

---

**2.** This back pay award excludes the $1,014 in partial payments that Jaros had to make for health insurance at her new employer. (See *Front Pay* discussion in the text below.) It also excludes the $980 in profits she claims she would have made on a stock option that she could have purchased and exercised if she

had remained at LodgeNet. Because a value cannot be placed on the stock option without speculating as to whether and when Jaros would have purchased and sold LodgeNet stock, the Court will not award back pay based on its speculated value.

able employment." *Ford Motor Co.*, 458 U.S. at 231, 102 S.Ct. 3057. Whether a claimant who returns to school exercises reasonable diligence depends upon the facts of a particular case. *See Dailey v. Societe Generale*, 108 F.3d 451, 456–58 (2d Cir.1997) (affirming an award of back pay); *Washington v. Kroger Co.*, 671 F.2d 1072, 1079 (8th Cir.1982) (affirming a reduction of back pay). In this case, it was reasonably diligent for Jaros to return to school. At the time of her resignation, Jaros had just finished a traumatic eight months working for Ted Racz and, by her own testimony, which the Court credits, she was afraid of working under the direct supervision of another man. Contrary to LodgeNet's analogy, taking college classes from male instructors at Augustana College did not present the same opportunities for harassment as working for Ted Racz did. While Jaros ultimately ended up working as a teacher under the supervision of another man, that does not mean that it was unreasonable for her to think in January 1999 that teaching would be a safer profession for her.

Such an award of back pay does not constitute a windfall to Jaros. In some cases, courts have held that a full-time student is ineligible for back pay, because attending school is really an investment in greater future earnings. *See Washington v. Kroger*, 671 F.2d at 1079 (citing *Taylor v. Safeway Stores, Inc.*, 524 F.2d 263, 268 (10th Cir.1975)). In this case, however, Jaros's post-graduation earnings have been comparable to her earnings at LodgeNet. There is no evidence that Jaros's future earnings as a teacher will exceed what her earnings at LodgeNet would have been. Rather, it appears that Jaros went back to college for an additional year—paying tuition and foregoing income—simply to maintain the level of earnings she already had. (Jaros already had a four-year degree in business administration and communication from Augus-

tana College.) While Jaros had been talking about going back to school before she quit, she did not decide to go back until after she quit. She probably would not even have considered going back at that time, had it not been for the actions of Ted Racz.

Finally, the Court will assume that Jaros would have received raises of 4% in 1999 and 2000. LodgeNet points out that its 4% raises were discretionary, and that there was evidence at trial that certain LodgeNet employees were concerned about Jaros's job performance. It is difficult to give much credibility to these reports, since they came mainly from Ted Racz, the man who harassed Jaros. If Jaros's performance did decline, that was probably due, at least in part, to the harassment she suffered. Under these circumstances, the Court will not punish Jaros by denying her these discretionary raises.

## B. *Front Pay*

 The issue of front pay requires the district court to consider all aspects of the case and to "address equitable needs such as the ability to obtain employment with comparable compensation and responsibility." *EEOC v. HBE Corp.*, 135 F.3d 543, 555 (8th Cir.1998). Jaros seeks an award of front pay with respect to health insurance and lost opportunity for promotion. LodgeNet paid Jaros's health insurance premiums, but her current employer requires her to pay $81.12 per month, which works out to $973.44 a year. As LodgeNet points out, Jaros's current health coverage has a lower deductible and may cover more services than the insurance plan she had at LodgeNet. Jaros has not provided a detailed comparison between her current plan and her plan at LodgeNet. In addition, the fact that Jaros now has to pay more for health insurance

must be weighed against the other benefits of her new job, such as the fact that she now only works ten months a year as a teacher. Jaros also asserts, without evidentiary support, that in going to work as a teacher she has less opportunity for promotion than she did at LodgeNet. On the whole, it appears that Jaros has obtained a comparable job with comparable benefits and has placed herself on a comparable career track. Under these circumstances, no front pay will be awarded.

### C. *Attorney Fees and Paralegal Charges*

■■■ Title VII gives a district court discretion to award a reasonable amount of attorney fees to a prevailing plaintiff. 42 U.S.C. § 2000e–5(k). The determination of fees is usually made by multiplying the number of reasonable hours by a reasonable rate. *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Jaros seeks an award of $52,630 in attorney fees, $23,160 in paralegal charges, and $4,547.40 in state service tax, for a total of $80,337.40. Her lawyer also seeks a 25% enhancement of his attorney fees. LodgeNet objects to the hourly rates charged by Jaros's lawyer and paralegal assistants, as well as the reasonableness of the hours billed and the enhancement sought by counsel.

#### 1. *Hourly Rates*

■■■■ The hourly rate charged by Jaros's lawyer is reasonable. The fee applicant has the burden of showing "that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v.*

*Stenson,* 465 U.S. 886, 956–96 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). An hourly rate of $190 for attorney fees is supported by the affidavit of Jaros's lawyer, Richard Casey, and the affidavit of another local attorney, Mark Meierhenry. Mr. Meierhenry's affidavit states that, in the legal community of Sioux Falls, South Dakota, "it is not unusual for experienced trial attorneys to charge in excess of $200.00 per hour for legal services in certain specialized areas of law." Many lawyers will not take sexual harassment cases. Plaintiff's counsel has developed a reputation in the community for skill and results in pursuing such claims. Mr. Casey's skill, experience, and reputation in litigating similar cases in Sioux Falls make $190 per hour a reasonable rate in this case.

■■■ An hourly rate of $75 for paralegal work is not adequately supported by the record. Jaros has filed an affidavit by her principal paralegal, Shiloh MacNally,[3] which states that $75 an hour is not only MacNally's rate while working for Mr. Casey, but also that MacNally's former employer, the local law firm of Cadwell Sanford Deibert & Garry, sometimes charged more than $100 for paralegal work.[4] After considering not only the material filed and the good education and experience levels of the Plaintiff's legal assistant but also the fact that a small percentage of the legal assistant's work was administrative rather than substantive, the Court finds that $60 an hour is an appropriate charge in this case. The compensable rates as found by the Court are supported by the efficient use of time reflected in the diary entries, the fact that the case was well tried by

---

3. Although Jaros has submitted bills from two paralegals, the vast bulk of paralegal time was billed by Shiloh MacNally. Another paralegal, Eve Island, billed twelve minutes to Jaros's case.

4. This decision by the Court does not endorse a rate of $100 an hour for legal assistant work in this geographic area. In the absence of unusual circumstances, such a charge seems excessive.

both sides, and the successful result obtained for the plaintiff.

## 2. *Reasonableness*

Despite LodgeNet's objections, the vast majority of the hours billed by Jaros's lawyer and paralegal are not redundant and were not unreasonably spent performing administrative tasks. The Court has already considered the paralegal's performance of some administrative tasks in setting the lodestar rate for her services, and has accordingly reduced the rate from the $75 per hour sought by the Plaintiff. In addition, the times billed by both the attorney and the paralegal are not unreasonably duplicative; rather they appear to be the product of careful and reasonable preparation. *See Rodriguez–Hernandez v. Miranda–Velez,* 132 F.3d 848, 860 (1st Cir. 1998). The time spent by counsel and the paralegal with a focus group helped plaintiff's counsel prepare for trial and is also compensable. The amounts billed, however, will be reduced to exclude duplicate entries by the paralegal on May 9, 2001 (4.7 hours) and May 13, 2001 (5.7 hours). The amounts will also be reduced to exclude 3 hours that the paralegal spent interviewing jurors after the case was over, in violation of Local Rule 47.2. The total reduction of time is 13.4 hours, which brings the total of compensable paralegal time down from 308.8 hours to 295.4 hours. Calculation of the compensable attorney fees and paralegal charges is summarized in the chart below.

| | Hours | Rate | Fees/Charges |
|---|---|---|---|
| Attorney | 277 | $190.00 | $52,630 |
| Paralegal | 295.4 | $ 60.00 | $17,740 |
| | | Subtotal | $70,370 |
| | | Tax (6%) | $ 4,222.20 |
| | | Total Plus Tax | $74,592.20 |

■■■■ The fact that Jaros's state-law claims were dismissed at the summary judgment stage does not warrant a further reduction in attorney fees. "If ... the claims on which the plaintiff lost are related to those on which [she] won, the court may award a reasonable fee." *Jenkins v. State of Missouri,* 127 F.3d 709, 718 (8th Cir.1997) (citing *Hensley,* 461 U.S. at 434–35, 103 S.Ct. 1933). "If the plaintiff has won an excellent result, [she] is entitled to a fully compensatory fee award, which will normally include time spent on related matters on which [she] did not win." *Id.* The claims which were dismissed—intentional infliction of emotional distress and breach of contract—were closely related to the Title VII claims on which Jaros ultimately prevailed. Under these circumstances, she is entitled to a fully compensatory award of attorney fees and paralegal charges.

## 3. *Enhancement*

■■■■ An enhancement of an attorney's lodestar rate is warranted only in rare and exceptional cases. *Forshee v. Waterloo Industries, Inc.,* 178 F.3d 527, 532 (8th Cir.1999). The applicant must establish more than just "outstanding service and results"—he or she must establish "that the quality of service rendered and the results obtained were superior to what one reasonably should expect in light of the hourly rates charged and the number of hours expended." *Id.* While the rates and hours spent by Jaros's attorney and paralegal were reasonable and yielded a successful result at trial, there has been no

showing that their performance met the standard required for an enhancement.

## CONCLUSION

While the judgment must be amended to comply with the statutory limits on compensatory damages, there is no basis for granting LodgeNet judgment as a matter of law or a new trial. While Jaros is not entitled to an award of front pay, she is entitled to back pay in the amount of $24,907.44 and attorney and paralegal fees in the amount of $74,592.20. Accordingly,

IT IS ORDERED:

(1) that the Motion to Amend Judgment (Docket No. 108) is granted, and the Clerk shall prepare an amended judgment in the amount of $300,000;

(2) that the Motion for Judgment as a Matter of Law (Docket No. 106) and Alternative Motion for New Trial (Docket No. 104) are both denied;

(3) that the Motion for Front Pay (Docket No. 101) is denied;

(4) that the Motion for Back Pay (Docket No. 98) and Motion for Attorney Fees (Docket No. 94) are both granted in part and denied in part; and

(5) that LodgeNet shall pay Jaros back pay in the amount of $24,907.44 and attorney fees and paralegal charges in the amount of $74,592.20.